IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KAREN CLARK & SOFIA MONTANO,<br><br>Plaintiffs,<br><br>v.<br><br>NUNA BABY ESSENTIALS, INC.,<br><br>Defendant. | Civil Action No.  1:21-cv-146<br><br>COMPLAINT  FOR  DECLARATORY AND INJUNCTIVE RELIEF |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

KAREN CLARK and SOFIA MONTANO ("Plaintiffs"), by and through undersigned counsel, seek a permanent injunction requiring a change in NUNA BABY ESSENTIALS, INC.'s ("Nuna", and "Defendant") corporate policies to cause its Website to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

## INTRODUCTION

1.      In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' Websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[1]

---

[1]      *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at

2.      Plaintiff Karen Clark is totally blind. Two weeks after Ms. Clark's twelfth birthday, she was hit by a car. Both of Ms. Clark's optic nerves detached in the accident, and she has been completely blind ever since. Ms. Clark uses VoiceOver for her iPhone 8 and JAWS to navigate the internet.

3.      Plaintiff Sofia Montano is legally blind. Ms. Montano has retinitis pigmentosa, which is a group of inherited disorders that cause degeneration of the retina and vision loss. Ms. Montano has progressively lost her vision since childhood and is now blind. Today, Ms. Montano uses screen readers, including the built-in Voiceover capability of her iPhone, combined with JAWS and NVDA software, to navigate the internet.

4.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use Websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring his to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a Website by listening and responding with his keyboard.

*Id*. at *6-7.[2]

_____

https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf) (last accessed May 20, 2021).
[2]      *See* American Foundation for the Blind, *Screen Readers*, *available at*

5.      Defendant is a leader in the design, development, manufacture, and distribution of car seats, strollers, and similar products, under its recognized brand Nuna.

6.      Consumers may purchase Defendant's products and access other brand-related content and services at https://nunababy.com/usa/ ("Website"), the Website Defendant owns, operates, and controls.[3]

7.      In addition to researching and purchasing Defendant's products and services from the comfort and convenience of their homes, consumers may also use Defendant's Website to contact customer service by phone and email, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.[4]

8.      Defendant is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

9.      Unfortunately, Defendant denies approximately 8.1 million[5] Americans who have difficulty seeing access to its Website's goods, content, and services because the Website is largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world.

---

https://www.afb.org/node/16207/screen-readers (last accessed May 20, 2021) (discussing screen readers and how they work).

[3]      Nuna Privacy Policy, *available at* https://nunababy.com/usa/privacy-policy (last accessed May 20, 2021).

[4]      *See, e.g.*, Nuna Home Page, *available at* https://nunababy.com/usa/ (last accessed May 20, 2021).

[5]      Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed May 20, 2021) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

10.     This discrimination is particularly acute during the current COVID-19 global pandemic.  According to the Centers for Disease Control and Prevention ("CDC"), Americans living with disabilities are at higher risk for severe illness from COVID-19 and, therefore, are recommended to shelter in place throughout the duration of the pandemic.[6]  This underscores the importance of access to online retailers, such as Defendant, for this especially vulnerable population.

11.     The COVID-19 pandemic is particularly dangerous for disabled individuals.[7] The overwhelming burden on hospitals is leading to a worry that emergency services will ration treatment. Although the Department of Health has ensured that no priority treatment will occur, disabled individuals are in fear that their diminished capacity to communicate will affect their treatment.[8] With public health experts expecting social distancing to extend through 2022, and the uncertainty surrounding businesses transitioning back to normal operations, the importance of accessible online services has been heightened. During these unprecedented times, disabled

---

[6] *See* Centers for Disease Control and Prevention Website, *Coronavirus Disease 2019 (2019), available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html (last accessed May 20, 2021) ("Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.").

[7]  *See* The New York Times, *'It's Hit Our Front Door': Homes for the Disabled See a Surge of Covid-19 (2020), available at* https://www.nytimes.com/2020/04/08/nyregion/coronavirus-disabilities-group-homes.html?smid=fb-nytimes&smtyp=cur (last accessed May 20, 2021) ("As of Monday, 1,100 of the 140,000 developmentally disabled people monitored by the state had tested positive for the virus, state officials said. One hundred five had died — a rate far higher than in the general population").

[8] *See* The Atlantic, *Americans With Disabilities Are Terrified (2020), available at* https://www.theatlantic.com/politics/archive/2020/04/people-disabilities-worry-they-wont-get-treatment/609355/ (last accessed May 20, 2021) (explaining that disabled individuals are inherently more susceptible to the virus, leading to complications in hospital in which the individuals are unable to effectively communicate with doctors while intubated).

individuals risk losing their jobs, experiencing difficulty acquiring goods and services like health care, and not having the information they need to stay safe.[9]

12.     Plaintiffs bring this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

13.     By failing to make its Website available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives blind and visually-impaired individuals the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

14.     Because Defendant's Website is not and has never been fully accessible, and because upon information and belief Defendant does not have, and has never had, adequate corporate policies that are reasonably calculated to cause its Website to become and remain

---

[9] *See* Slate, *The Inaccessible Internet 2020, available at* *https://slate.com/technology/2020/05/disabled-digital-accessibility-pandemic.html* (last accessed May 20, 2021).

accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring

Defendant to:

a) Retain a qualified consultant acceptable to Plaintiffs ("Web Accessibility Consultant") who shall assist in improving the accessibility of its Website, including all third-party content and plug-ins, so the goods and services on the Website may be equally accessed and enjoyed by individuals with vision related disabilities;

b) Work with the Web Accessibility Consultant to ensure all employees involved in Website and content development be given web accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

c) Work with the Web Accessibility Consultant to perform an automated accessibility audit on a periodic basis to evaluate whether Defendant's Website may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

d) Work with the Web Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on Websites, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Incorporate all of the Web Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Work with the Web Accessibility Consultant to create a Web Accessibility Policy that will be posted on its Website, along with an e-mail address, instant messenger, and toll-free phone number to report accessibility-related problems;

g) Directly link from the footer on each page of its Website, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website;

h) Accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

i) Provide a notice, prominently and directly linked from the footer on each page of its Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to

provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Web Accessibility Policy;

j)  Provide a copy of the Web Accessibility Policy to all web content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website;

k)  Train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l)  Modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology;

m) Plaintiffs, their counsel, and their experts monitor the Website for up to two years after the Mutually Agreed Upon Consultant validates the Website are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiffs, through their counsel and their experts, shall be entitled to consult with the Web Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Website Accessibility Consultant provides Defendant.

15.  Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

16.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

17.     Defendant participates in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant entered into contracts for the sale of its products and services with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Suchenko v. ECCO USA, Inc., No. 18cv0562, 2018 U.S. Dist. LEXIS 129862 (W.D. Pa. Aug. 2, 2018);Gniewkowski v. Lettuce Entertain You Enters., 251 F. Supp. 3d 908 (W.D. Pa. 2017); Gathers v. N.Y. & Co., No. 16cv1375, 2017 U.S. Dist. LEXIS 11653 (W.D. Pa. Jan. 27, 2017).*

18.     Plaintiffs were injured when they attempted to access Defendant's Website from their homes, including in this District, but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services.

19.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claim occurred.

## PARTIES

20.     Plaintiff Clark is and, at all times relevant hereto, has been a resident of Crawford County, Pennsylvania. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq.

21.     Plaintiff Montano is and, at all times times relevant hereto, has been a resident of Clark County, Nevada. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101et seq.

22.     Defendant Nuna is a Pennsylvania corporation with its principal place of business at 70 Thousand Oaks Blvd., Morgantown, Pennsylvania, 19543.

## FACTS APPLICABLE TO ALL CLAIMS

23.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

24.     Defendant's Website allows consumers to research and participate in Defendant's services and products from the comfort and convenience of their own homes.

25.     The Website also enables consumers to contact customer service by phone and instant messenger, sign up to receive product updates, product news, and special promotions, review important legal notices like Defendant's Privacy Policy and Terms and Conditions, and more.

26.     Consumers may use the Website to connect with Defendant on social media, using sites like Facebook, Twitter, Instagram, and YouTube.

## HARM TO PLAINTIFFS

27.     Plaintiffs attempted to access the Website from Ms. Clark's home in Crawford County, Pennsylvania, and Ms. Montano's home in Clark County, Nevada. Unfortunately, because of Defendant's failure to build the Website in a manner that is compatible with screen reader programs, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access on the Website. The following are illustrative (but, importantly, not exhaustive) examples of a few of the accessibility barriers observed on the Website:

a.     Defendant's Website's "Explore" menu is not accessible. The "Explore" button opens a side menu, which reveals all of the menu items for the Website. Users must open this section to access the menu items. The "Explore" button does not show a visible focus, so keyboard-only users will not know when they are on this button. When the button is pressed, the menus are displayed immediately, but they are not announced, and focus does not move into the newly displayed menu. Screen reader users are not aware that a menu is present.



b.      The "Bag" icon on Defendant's Website is not labeled. The "Bag" icon is announced as "link." Users do not hear the purpose or destination of the link. When there is an item in the bag, users hear "1 item link." This also fails to provide an accurate label to users.



c.      The "Buy Now" button on Defendant's Website redirects users to a third-party site without notice. When choosing a different color for a "Triv" stroller, the "Buy Now" button redirects users to a different website to proceed with the product purchase. Users will not be aware that they have been redirected to a different site because the screen reader does not make this announcement upon clicking the button. The user is simply directed to a different site. A mechanism or button to return users to the Nuna Website is not announced.



28.     These barriers, and others, deny Plaintiffs full and equal access to all of the services the Website offers, and now deter them from attempting to use the Website. Still, Plaintiffs intend to attempt to access the Website in the future to research the products and services the Website offer, or to test the Website for compliance with the ADA.

29.     If the Website was accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiffs could independently research and purchase Defendant's products and access its other online content and services.

30.     Though Defendant may have centralized policies regarding the maintenance and operation of the Website, Defendant has never had a plan or policy that is reasonably calculated to make the Website fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

31.     The law requires that Defendant reasonably accommodates Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

32.     Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

## DEFENDANT'S KNOWLEDGE OF WEBSITE ACCESSIBILITY REQUIREMENTS

33.     Defendant has long known that sufficient contrast and skip navigation links are necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

34.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' Websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

35.     There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

36.     While the DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

37.     Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

38.     Resolution of Plaintiffs' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website, and (b) whether Plaintiffs can access the content and services.

**SUBSTANTIVE VIOLATIONS**

**COUNT I**

**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

39.     The assertions contained in the previous paragraphs are incorporated by reference.

40.     Defendant's Website is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

41.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiffs with full and equal access to its Website, they have violated the ADA.

42.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

43.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

44.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

45.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit, among other Courts, has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*,

14

630 F.3d 1153, 1163 (9th Cir. 2011); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381,

395 (E.D.N.Y. 2017).

46.     By failing to provide its Website's content and services in a manner that is

compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing,

or other arrangements, in illegal disability discrimination, as defined by Title III, including without

limitation:

(a)     denying individuals with visual disabilities opportunities to participate in

and benefit from the goods, content, and services available on its Website;

(b)     affording individuals with visual disabilities access to its Website that is not

equal to, or effective as, that afforded others;

(c)     utilizing methods of administration that (i) have the effect of discriminating

on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common

administrative control;

(d)     denying individuals with visual disabilities effective communication,

thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or

procedures where necessary to afford its services, privileges, advantages, or accommodations to

individuals with visual disabilities.

47.     Defendant has violated Title III by, without limitation, failing to make its Website's

services accessible by screen reader programs, thereby denying individuals with visual disabilities

the benefits of the Website, providing them with benefits that are not equal to those it provides

others, and denying them effective communication.

48.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

49.     Making its online goods, content, and services compatible with screen reader programs does not change the content of Defendant's Website or result in making the Website different, but rather enables individuals with visual disabilities to access the Website Defendant already provides.

50.     Defendant's ongoing violations of Title III have caused, and in the absence of an injunction, will continue to cause harm to Plaintiffs and other individuals with visual disabilities.

51.     Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

52.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website was fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website into full

compliance with the requirements set forth in the ADA, and its implementing regulations, so that

its Website is fully accessible to, and independently usable by, blind individuals, and which further

directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant

has adopted and is following an institutional policy that will in fact cause them to remain fully in

compliance with the law—the specific injunctive relief requested by Plaintiffs is described more

fully in paragraph 14 above.

        (C)     Payment of costs of suit;

        (D)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR

§ 36.505, including costs of monitoring Defendant's compliance with the judgment (*see*

*Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa.

Jan. 11, 2018) (ECF 191) ("Plaintiffs, as the prevailing party, may file a fee petition before the

Court surrenders jurisdiction. Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for*

*Clean Air*, 478 U.S. 546, 559 (1986), *supplemented*, 483 U.S. 711 (1987), the fee petition may

include costs to monitor Defendant's compliance with the permanent injunction."); *see also Access*

*Now, Inc. v. LAX World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11) (same);

        (E)     The provision of whatever other relief the Court deems just, equitable and

appropriate; and

        (F)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

Dated: May 20, 2021                Respectfully Submitted,

                                    /s/ Benjamin J. Sweet
                                    Benjamin J. Sweet
                                    ben@nshmlaw.com
                                    **NYE, STIRLING, HALE & MILLER, LLP**
                                    1145 Bower Hill Road, Suite 104
                                    Pittsburgh, Pennsylvania 15243

Jonathan D. Miller
jonathan@nshmlaw.com
**NYE, STIRLING, HALE & MILLER, LLP**
33 W. Mission Street, Suite 201
Santa Barbara, California 93101

*Attorneys for Plaintiffs*